## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RAY PELTIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 1:24-CV-452 |
| LEPAGE BAKERIES PARK STREET | ) | |
| LLC, CK SALES CO., LLC, and | ) | |
| FLOWERS FOOD, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

JOHN J. MCCONNELL, Jr., United States District Court Chief Judge.

Plaintiff Ray Peltier brought this action against Lepage Bakeries Park Street LLC ("Lepage"), CK Sales Co., LLC ("CK Sales"), and Flowers Foods, Inc. ("Flowers Foods"), alleging that the Defendants misclassified him as an independent contractor in violation of Rhode Island and federal law. ECF No. 1. In response, the Defendants bring forth this Motion to Compel Arbitration and Stay Proceedings, asserting that Mr. Peltier contractually agreed to submit such claims to binding arbitration under the Federal Arbitration Act ("FAA")—or under Rhode Island's Arbitration Act—and thus requests the Court to compel arbitration of this misclassification dispute. ECF No. 11. For the reasons stated below, the Court GRANTS the Defendants' Motion to Compel Arbitration and Stay Proceedings.

## I.    BACKGROUND[1]

Flowers Foods is a holding company of various subsidiary bakeries, including defendant Lepage.  ECF No. 11-1 at 2.  To get its products onto the shelves of businesses, Lepage uses a direct-store-delivery system, in which its wholly-owned subsidiary, defendant CK Sales, sells to "independent distributors" the "distribution rights to sell and distribute Lepage's products in defined geographic territories."  *Id.* A "Distributor Agreement" generally governs the relationship between the Defendants and the independent distributors—under which the Defendants classify independent distributors as independent contractors.  ECF No. 1 ¶ 11; *see also* ECF No. 10 ¶ 14.

Between 2017 and 2022, Mr. Peltier, through his distribution company K A Peltier Distributing Inc. ("KAP"), purchased certain distribution rights from three separate Lepage distributors: BigLidBread, Inc, The Dude Inc., and Early Bird Distributing Corp.  ECF No. 11-1 at 3-4.  The distribution rights that KAP acquired granted it the rights to sell the Defendants' baked goods in two territories based out of a warehouse in Providence, Rhode Island.[2]  ECF No. 11-2 at ¶¶ 5, 7.  In these respective transactions, KAP assumed the rights and obligations under existing Distributor Agreements that CK Sales entered into with the three Lepage distributors.  *See* ECF No. 12 at 5-6; ECF No. 11-2 ¶¶ 5, 7, 8.  In two of these

---

[1] The Court takes the relevant facts from the complaint and the documents submitted in connection with the Defendants' Motion to Compel and Stay Proceedings.  *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 55 (1st Cir. 2018).

[2] Mr. Peltier has since abandoned the second territory he acquired and currently distributes only in one territory. ECF No. 12 at 6 n.24.

transactions,[3] Mr. Peltier signed a separate personal guaranty in his individual capacity, which committed him to guaranteeing KAP's compliance with the terms, conditions and obligations of the respective Distributor Agreements now existing between KAP and CK Sales. ECF No. 11-3 at 7; ECF No. 11-4 at 8.  Incorporated in one of the Distributor Agreements was an Arbitration Agreement requiring that any claims or disputes arising from or related to the parties' Distributor Agreement be determined "exclusively by binding arbitration under the [FAA] . . .." ECF No. 11-3 at 13.  Claims covered under the Arbitration Agreement include claims: (1) alleging that the independent distributor was misclassified as an independent contractor; and (2) for unpaid compensation. *Id.* at 14.

The Distributor Agreements prescribe various standards and guidelines that KAP must follow when conducting its distributor operations.  KAP is required to use "commercially reasonably best efforts" to maximize sales of the Defendants' products within KAP's territories. ECF No. 11-3 at 23.  KAP must make such efforts according to "Good Industry Practice," which includes "actively soliciting" unserved businesses, maintaining a fresh supply of the Defendants' products, and promptly removing all stale products. *Id.* at 21.  KAP is prohibited from carrying: (1) "outside merchandise" that competes with the Defendants' products; and (2) noncompetitive products that interferes with the distribution of the Defendants' products.  *Id.* at 23.  KAP must

---

[3] Mr. Peltier signed a separate Personal Guaranty after assuming BigLidBread, Inc.'s Distributor Agreement with CK Sales, and again after assuming The Dude Inc.'s Distributor Agreement with CK Sales, pursuant to KAP's purchases of those entities' relevant distribution rights.  ECF No. 11-1 at 3-4.

"maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [the Defendants] and customer requirements." *Id.* Further, KAP must use the CK Sales' "proprietary administrative services" for KAP to communicate with CK Sales, collect sales data, receive suggested orders for each customer, and receive other logistical information. *Id.* at 26-27.

The Distributor Agreements did not require KAP's obligations to be performed personally or by any one individual working for KAP—granting KAP discretion to hire any personnel necessary to discharge KAP responsibilities. ECF No. 11-3 at 31. That said, Mr. Peltier personally performs the services required to distribute the Defendants' products. ECF No. 12 at 6. Mr. Peltier asserts that he works more than fifty hours per week, mostly driving, to distribute such goods within his territory. *Id.* The products Mr. Peltier delivers are produced in Maine, then delivered to the Defendants' Rhode Island warehouse in trucks that they own and control. *Id.* at 6-7. Then, Mr. Peltier picks up the products from that warehouse for delivery to the customer stores in his territory. *Id.* at 7.

Now, Mr. Peltier has filed this five-count suit, alleging the Defendants misclassified him as an independent contractor—amounting to violations of the Fair Labor Standards Act, 29 U.S.C. § 207, (Count V), and Rhode Island labor laws (Counts I-IV).[4] ECF No. 1 at 8-10. Under the parties' Arbitration Agreement, the Defendants moves to compel arbitration under the FAA, or Rhode Island law, and to

---

[4] Mr. Peltier asserts violations of the: (1) Rhode Island Minimum Wage Act, R.I. Gen Laws § 28-12-3, (Count IV); and (2) Rhode Island Payment of Wages Act, R.I. Gen Laws §§ 28-14-19.1, 28-14-2, 28-14-3.2 (Counts I-III). ECF No. 1 at 8-9.

stay this case pending such arbitration. ECF No. 11. Thus, at issue here is whether the Arbitration Agreement is enforceable against Mr. Peltier under the FAA or state law.

## II.    STANDARD OF REVIEW

The FAA is Congress's embodiment of a "liberal federal policy favoring arbitration." *Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 167 (1st Cir. 2022) (quoting *Rivera-Colón v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019)). Due to that liberal policy, the FAA places arbitration agreements "on equal footing with all other contracts." *Id.* (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443 (2006)). Thus, "courts must treat arbitration as 'a matter of contract' and enforce agreements to arbitrate 'according to their terms.'" *Id.* (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019)). But the FAA's arbitration-favoring policy is triggered only "when the parties actually agreed to arbitrate." *Id.* at 168 (quoting *Rivera-Colón*, 913 F.3d at 207). A valid, enforceable agreement to arbitrate must exist and be identified to "trigger the FAA's protective reach." *Id.* (citing *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80 (1st Cir. 2018)).

Ultimately, the party seeking to compel arbitration bears the burden of proving that: (1) "a valid agreement to arbitrate exists," (2) "the movant is entitled to invoke the arbitration clause," (3) "the other party is bound by that clause," and (4) "the claim asserted comes within the clause's scope." *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011) (quoting *InterGen N.V. v. Grina*, 344

5

F.3d 134, 142 (1st Cir. 2003)).  In evaluating motions to compel arbitration, courts generally must apply the summary judgment standard.  *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021).  Accordingly, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in their favor.  *Id.* (citing *Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92 (1st Cir. 2021)).  "If the non-moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." *Id.* (citing. 9 U.S.C. § 4).

## III.  DISCUSSION

Mr. Peltier does not dispute that he entered a valid arbitration agreement that governs his claims against the Defendants.  However, Mr. Peltier asserts that he cannot be compelled to arbitrate because he falls under the category of transportation worker that are exempt from arbitration under § 1 of the FAA. ECF No. 12 at 9.  But the Defendants raise three reasons why that exemption does not apply to Mr. Peltier: (1) the Distributor Agreement between CK Sales and KAP is not "a contract of employment of . . .workers"; (2) Mr. Peltier is not the type of worker to which Congress intended § 1 of the FAA's residual clause to apply; and (3) Mr. Peltier is not engaged in interstate commerce in his role as an independent distributor.  *See* ECF No. 11-1 at 12-22.  Alternatively, the Defendants argue that even if Mr. Peltier qualified for § 1's "transportation" worker exemption, his claims are still subject to arbitration under Rhode Island law.  *Id.* at 23.

As Mr. Peltier underscored, § 1 of the FAA exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the statute's general mandate to enforce a valid arbitration agreement. 9 U.S.C. § 1. The Supreme Court prescribed a narrow construction to § 1, stating that it applies only to "contracts of employment of transportation workers" engaged in foreign or interstate commerce. *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 118-19 (2001)). Ultimately, whether there was a "contract of employment" between Mr. Peltier and the Defendants is the dispositive inquiry here.

### A.    Whether the Distributor Agreements are "Contract[s] of Employment of . . . Workers" Under § 1 of the FAA

The Defendants claim that § 1 does not apply to Mr. Peltier because the Distributor Agreements between CK Sales and KAP was not a "contract of employment of . . . workers" but a contract between two business entities. ECF No. 11-1 at 13. This argument raises a matter of first impression within the First Circuit. The Supreme Court and the First Circuit have defined what the term "contracts of employment" mean only in a limited sense. In *New Prime Inc, v. Oliveria,* the Supreme Court affirmed the First Circuit's holding that the term "contracts of employments" applies not only to employer-employee agreements to perform work, but also independent contractors' agreements to perform work. 586 U.S. 105, 116 (2019), *aff'g* 857 F.3d 7 (1st Cir. 2017). The Supreme Court ultimately determined that Congress used the term "contracts of employment" broadly, capturing "any contract for the performance of *work* by *workers*." *Id.* This interpretation of § 1, while

helpful, does not answer whether "contracts of employment of . . . workers" encompass contracts between two business entities.   Thus, the Court must look to the out-of-circuit legal landscape on this issue to guide its analysis.

The Nine Circuit addressed whether a commercial contract between two business entities qualified as a "contract of employment" in *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190 (9th Cir. 2024).   In that case, several corporate entities that contracted with Amazon to serve as "delivery service partners" ("DSPs") filed a federal-class action complaint against Amazon on behalf of former and current DSPs.   *Id.* at 1192.   Relying on the arbitration provision in the respective DSP Agreements that the parties executed, Amazon moved to compel arbitration in response to the complaint.   *Id.*   But the plaintiffs argued that they were exempt from arbitration, under § 1 of the FAA, because they qualified as transportation workers. *Id.* at 1196.

However, the Ninth Circuit rejected the plaintiffs' arguments, holding that § 1's transportation worker exemption did not apply to non-natural persons like the plaintiff business entities.   *See id.*   To reach this result, the court interpreted § 1 using the statutory construction principle of *ejusdem generis*—which dictates that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* (quoting *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001)).   The court noted that § 1's residual clause—"any other class of workers"—followed specific words—"seamen" and "railroad employees"—which are

words that describe "*natural persons* who are *individual workers.*" *Id.* at 1195 (emphasis added). Thus, the court gave the residual clause the narrow construction that the Supreme Court prescribed and refused to expand § 1's transportation worker exemption "to cover non-natural persons like the business entities that are the plaintiffs." *Id.*

Relatedly, the *Fli-Lo* court also held that "'contracts of employment' in the transportation worker exemption do not extend to commercial contracts like the DSP Agreements." 97 F.4th at 1196. Based on the Supreme Court's instruction that "contracts of employment" captured "any contract for the performance of *work* by *workers,*" the Ninth Circuit determined that "for a contract to *be* a contract of employment covered by § 1, it must have a *qualifying worker* as one of the parties." *Id.* at 1196-97 (quoting *New Prime*, 586 U.S. at 116). Thus, the court found it pertinent that the DSP Agreements between Amazon and the plaintiffs called for "transportation, delivery, and related services … performed by the business entity that [plaintiffs] represent" and gave the plaintiffs "exclusive responsibility for [their] Personnel, including exclusive control over compensation, hours, and working conditions." *Id.* In essence, the Ninth Circuit reasoned that the DSP Agreement was a contract for work by corporate businesses, not a contract for work by a specific human worker—i.e., not a "contract of employment"—and thus § 1 was not applicable to the business plaintiffs.

Other courts have reached a similar conclusion where business entity plaintiffs have attempted to invoke § 1 to shield themselves from arbitration. *See Tillman*

*Transp., LLC v. MI Bus. Inc.*, 95 F.4th 1057, 1064 (6th Cir. 2024) (affirming that "commercial contract between two business entities is not a contract of employment."); *Amos v. Amazon Logistics, Inc.*, 74 F.4th 591, 596 (4th Cir. 2023) (holding that DSP agreement between Amazon and corporate plaintiff was not a "contract of employment" because "it did not promise work and compensation to an individual employee," but required "certain business services to be provided by one business to another. . .."); *R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020) (holding that agreement between corporate plaintiff and corporate defendant was a "commercial contract between two business entities" and could not be reasonably construed as "a contract of employment governing 'work by workers.'").

The Defendants rely on these cases to assert that the Distributor Agreements with KAP are not contracts of employment. However, Mr. Peltier contends that these cases are distinguishable because the holdings in *Fli-Lo Falcon, Tillman,* and *Amos* hinged on the fact that the respective plaintiffs were all business entities, i.e., "non-natural persons" rather than an "actual human" transportation worker like in this case. *Id.* at 20 (citations omitted). He asserts that, unlike the business plaintiffs in those cases, he: (1) brings these wage and misclassification claims in his individual capacity as a distributor of the Defendants' products; (2) personally performs the contracted distributing work; and (3) was party to the Distributor Agreement via the incorporated Personal Guaranty he signed and the Arbitration Agreement he was personally bound to as KAP's owner. *Id.*

10

The Defendants counter, asserting that § 1's applicability does not depend on the plaintiff's status or claim type but whether the contract at issue is covered by § 1. ECF No. 14 at 5. Further, the Defendants argue that neither the Arbitration Agreement nor Personal Guaranty transform the Distributor Agreement into a contract of employment because the Distributor Agreement did not require the KAP's duties to "be conducted personally or by any specific individual." *Id.* at 4. The Defendants also emphasize that: (1) Mr. Peltier was subject to the Arbitration Agreement merely "to prevent evasion of the agreement to arbitrate via a disregard for corporate formalities"; and (2) the Personal Guaranty explicitly states that the Distributor Agreement was between KAP and CK Sales—not between Mr. Peltier and the Defendants. *Id.*

The fact that Mr. Peltier—in his individual capacity—signed the Personal Guaranty and filed this suit does distinguish this case from those upon which the Defendants rely. In *Amos*, a business entity and its owner were the plaintiffs, but the court refused to find that the owner was a "transportation worker" that had a "contract of employment" with the defendant, Amazon, because the owner's business and Amazon were the only parties to the agreement at issue—not the owner in her individual capacity. 74 F.4th at 597 ("plaintiff Amos is not a party to the Agreement — and so her central arguments that she was a 'transportation worker' and had a 'contract of employment' with Amazon fall completely flat."). In *Fli-Lo*, the court pointed out that "no plaintiff is a transportation worker" that qualified for § 1's exemption because the plaintiffs were business entities rather than natural persons.

97 F.4th at 1196.  In *Tillman*, the court acknowledged that the business entity plaintiff's owner was party to one of the contracts with the defendant but noted that the owner did not bring the suit in his individual capacity—and, even if he had, the owner provided no evidence that he was a transportation worker.  95 F.4th at 1063–64.

These cases reiterate the *Fli-lo* court's holding that "for a contract to *be* a contract of employment covered by § 1, it must have a *qualifying worker* as one of the parties."  97 F.4th at 1196-97.  And these cases foreclose non-natural persons, like business entities, from asserting that they are a "qualifying worker" that was party to a "contract of employment" but do not foreclose natural persons, like Mr. Peltier, from making such assertions.  Thus, the key inquiry here is whether Mr. Peltier signing the Personal Guaranty in his individual capacity and being personally bound to the Arbitration Agreement made the Distributor Agreements a "contract of employment" between him and the Defendants.

Recall that the Personal Guaranty required Mr. Peltier to personally guarantee KAP's compliance with the terms, conditions, and obligations of the Distributor Agreements.  ECF No. 11-3 at 7; ECF No. 11-4 at 8.  But does such a guarantee require Mr. Peltier to personally ensure and *perform* KAP's distributing obligations under the Distributor Agreement?  In practice, Mr. Peltier felt compelled to personally perform KAP's obligations to ensure his compliance with the Personal Guaranty because, as KAP's owner, Mr. Peltier could not afford to hire an employee to perform KAP's obligations.  ECF No. 12 at 20-21.  But in form, the Personal

Guaranty does not mandate that Mr. Peltier personally perform KAP's obligations. The Personal Guaranty simply gives CK Sales the right to demand that Mr. Peltier guarantee KAP's performance of its obligations under the Distributor Agreements— *if* KAP defaults on such obligations.[5]  ECF No. 11-4 at 8.  Such a guarantee does not require Mr. Peltier to act jointly with KAP to perform its contracted obligations. Thus, the Court cannot reasonably construe the Personal Guaranty to be a contract of employment that governs "work by workers" because it contemplates only the guarantee of work by a business entity—KAP.

Next, Mr. Peltier appears to suggest that being subject to the Arbitration Agreement makes him party to the Distributor Agreements.  ECF No. 12 at 19.  Mr. Peltier asserts that the Arbitration Agreement "explicitly refers to 'claims alleging that DISTRIBUTOR was misclassified as an independent contractor.'"  *Id.*  He notes that though "DISTRIBUTOR" is defined as the corporate entity that signed the Distributor Agreement, it is clear "that reference plainly was targeted at potential claims by Mr. Peltier personally, which is . . . why the Defendants argue that the parties to this case agreed to arbitration."  *Id.* at 19-20.  However, it is unclear how Mr. Peltier being subject to the Arbitration Agreement makes him contractually bound to perform any of KAP's obligations under the Distributor Agreement.  The relevant inquiry here is whether Mr. Peltier was party to a contract with the

---

[5] The Personal Guaranty provides that "[i]f any term, condition or obligation of the Distributor Agreement is not complied with, performed, or paid by [KAP] . . ., [Mr. Peltier] will, upon [CK Sales'] demand, immediately ensure the timely and complete performance of KAP of each and every obligation and duty imposed on it by the Distributor Agreement . . . ."  ECF No. 11-4 at 8.

Defendants that called for "work by workers" as to constitute a contract of employment. Nothing in the Distributor Agreement or the incorporated Arbitration Agreement instructs that any one individual must personally perform KAP's obligations. Rather, the Distributor Agreement instructs the contrary, indicating that:

> This [Distributor] Agreement does not require that DISTRIBUTOR's obligations be conducted personally, or by any specific individual in DISTRIBUTOR's organization. DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR's responsibilities hereunder.

ECF No. 11-3 at 31. Accordingly, the Arbitration Agreement does not give rise to a contract of employment between Mr. Peltier and the Defendants.

In sum, Mr. Peltier has not proffered evidence sufficient for a reasonable factfinder to conclude that he entered into a "contract of employment" with the Defendants. Without evidence of such a contract, Mr. Peltier cannot invoke § 1's transportation worker exemption to avoid his agreement to arbitrate his misclassification and wage claims against the Defendants under the FAA.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS the Defendants' Motion to Compel Arbitration and Stay Proceedings. ECF No. 11.

IT IS SO ORDERED.


_____
John J. McConnell, Jr.
United States District Chief Judge


March 20, 2025